```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
MARINE STEEL TRANSPORT LINE,
LLC, THORNTON TRANSPORTATION
& TOWING, LLC,                                          MEMORANDUM AND ORDER
                                                        Case No. 19-CV-2275-FB-SJB
           Plaintiffs,

      -against-

EASTERN METAL RECYCLING,
LLC, CAMDEN IRON & METAL,
INC., T&T SCRAP, LLC, SAL'S
METAL CORP.,

           Defendants.
---------------------------------------------------x
```

*Appearances:*
For the Plaintiffs:
DERRICK STORMS
Solomos & Storms
33-08 Broadway
Astoria, New York 11106

*For Defendants Eastern Metal Recycling, LLC, and Camden Iron & Metal, Inc.:*
FRANK P. DEGUILIO
CHARLES P. NEELY
Palmer Biezup & Henderson, LLP
140 Broadway, 46th Floor
New York, New York 10005

**BLOCK, Senior District Judge:**

In this admiralty action, the plaintiffs, Marine Steel Transport Line, LLC, and Thornton Transportation & Towing, LLC (collectively, "Marine Steel"), allege that their barges were damaged by the loading and unloading of scrap metal during a charter. Their claims against two defendants—T&T Scrap, LLC ("T&T"), and Sal's Metal Corp. ("Sal's"), were settled; the claims against the remaining

defendants—Eastern Metal Recycling, LLC, and Camden Iron & Metal, Inc. (collectively, "EMR")—proceeded to a bench trial, which was held on January 9, January 10, February 26, February 28, and April 2, 2024. The following represent the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## BACKGROUND

Formed in 2006, Marine Steel began as a marine towing business. Beginning in 2011, it expanded its operations to include barge transportation services. To that end, it acquired the three barges at issue in this case: Barge 2000, a 63-year-old vessel acquired in 2011 for $105,000; Marine Steel 1, a 27-year-old vessel acquired in 2015 for $54,000; and Marine Steel 2, a 27-year-old vessel acquired in 2015 for $54,000.

EMR, a UK-based company, purchases scrap metal from third parties, including T&T and Sal's. Because U.S law requires goods to be transported between domestic ports only by U.S.-owned vessels, *see* Merchant Marine Act of 1920, § 27, Pub. L 66-261, 41 Stat. 988 (1920), EMR required an American company to transport the scrap to its facility at Port Newark, New Jersey. Thus, in December 2011, EMR engaged the services of Marine Steel. Marine Steel agreed to make the three barges available for EMR's exclusive use and to provide

a tugboat captained by one of its employees. Over the next several years, the tugboat would tow the barges to T&T and Sal's scrapyards, where employees of those companies would load the barges with scrap metal. Marine Steel's tugboat would then tow the barges to EMR's facility, where EMR employees would offload the scrap.

The parties' agreement was not reduced to writing. However, their court of dealings reflects that Marine Steel would, from time to time, bill EMR for damages to the barges during loading and unloading operations, and that EMR would pay those bills. In addition, with respect to Marine Steel 2, it agreed in writing to pay for "debris removal and steel repairs other than those considered to be normal wear and tear." Am. Compl., Ex. 5. Based on this course of dealing, there is no serious dispute that EMR assumed a contractual duty to pay for repairs to the barges beyond normal wear and tear.

On September 25, 2018, EMR informed Marine Steel that it was terminating their at-will arrangement. Later surveys of the barges (known as "off-hire" surveys in the industry) revealed extensive damages, mostly caused by employees of T&T and Sal's using a grapple to move the barges during their loading operations. Quotes from local shipyards estimated that it would cost around $150,000 to return the barges to "serviceable" condition, or around $300,000 to

3

return them to "as built" condition. EMR refused to pay for any repairs. Lacking the funds to do so itself, Marine Steel sold the barges for scrap and ceased operations. This lawsuit followed.

## CONCLUSIONS OF LAW

Normally, the Court would begin by making the findings necessary to resolve any disputed issues of fact. In this case, however, there are several disputed issues *of law* that it must address first.

### A.   Measure of Damages

The parties' principal dispute concerns the proper measure of Marine Steel's damages. As the Court has previously noted, "[t]he concept that a contractual obligation to repair does not extend beyond the fair market value of the repaired vessel is well-established in maritime law." *Marine Steel Transp. Line, LLC v. Eastern Metal Recycling, LLC*, 2023 WL 3603489, at *3 (E.D.N.Y. May 23, 2023) (citing *Asphalt Int'l, Inc. v. Enterprise Shipping Corp.*, 514 F. Supp. 1111, 1113 (S.D.N.Y. 1981), for the proposition that "when a ship is a constructive total loss, one would not expect there to be a persisting duty to repair, unless the charter contained an explicit agreement to the contrary. This rule of maritime law reflects the longstanding rule generally applicable in cases of property damage, regardless of whether the action sounds in tort or contract:

4

> The damages sustained by an automobile in a collision may be established by showing the reasonable cost of the repairs necessary to restore it to its former condition, although the general rule is that the measure of damages to personal property is the difference between its market value immediately before and immediately after the injury. This rule is subject to the limitation, first, that the cost of repairs must be less than the diminution in market value due to the injury, and, secondly, that the repairs must never exceed the value of the automobile itself as it was before the injury. The plaintiff should not benefit by the loss. Where the automobile is totally destroyed, the measure of damages is its reasonable market value immediately before destruction. There can be no recovery beyond such value for mere repairs.

*Gass v. Agate Ice Cream*, 264 N.Y. 141, 143-44 (1934) (citations omitted); *see also Kanematsu-Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir. 1987) ("Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive."). As the Second Circuit has noted, these rules are "equally applicable to vessels injured through collision on maritime waters." *O'Brien Bros. v. The Helen B. Moran*, 160 F.2d 502, 505 (2d Cir. 1947).

One might reasonably question—as the Court did during the trial—whether a plaintiff who receives the amount of money necessary to restore his property to its previous condition truly "benefit[s] by the loss" if the diminution in its fair market value is less than the cost of obtaining a comparable replacement. But the

5

law in this regard is too settled for the Court to revisit its previous holding. In any event, the parties have essentially accepted that holding, although—as will be seen—they sharply dispute the evidence regarding the barges' fair market value prior to the damage. In that regard, it is important to note that the vessel owner "establishe[s] its prima facie case by proof of the extent of the damage and the cost of repairs." *The Ruthie M.*, 4 F. Supp. 317, 318 (E.D.N.Y. 1933). The burden then shifts to the defendant "to show that such damages exceeded the fair market value of the . . . barges." *Id.*

**B.     Duty to Mitigate Damages**

In connection with the parties' motions for summary judgment, EMR argued that Marine Steel had a duty to protect its barges from damage because it had knowledge that T&T and Sal's were improperly using a grapple to move them. As the Court explained, that duty arises "for claims of negligence, not breach of contract." *Marine Steel*, 2023 WL 3603489, at *2. It then acknowledged that "[t]here are similar duties in contract cases, such as the injured party's 'obligation to make reasonable efforts to mitigate its damages.'" *Id.* (quoting *APL Co. PTE v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010)). But the injured party need not take steps to mitigate damages "where the breaching party had the same opportunity to prevent damages." *Travelers Indem. Co. v. Maho*

6

*Mach. Tool Corp.*, 952 F.2d 26, 31 (2d Cir. 1991). Moreover, "if plaintiff takes such mitigating action within the range of reason, the breaching party remains liable if such reasonable attempts at mitigation fail." *APL Co.*, 592 F.3d at 111 (internal quotation marks and alteration omitted).

### C. Consequential Damages

As the Court has previously explained, consequential damages are "not recoverable in an action to recover damages for breach of contract in the absence of the plaintiff's showing that such damages were foreseeable and within the contemplation of the parties at the time the contract was made." *Marine Steel*, 2023 WL 3603489, at *1.

### D. Apportionment of Damages

EMR argues that the Supreme Court's decision in *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994), requires the Court to allocate fault among *all* the defendants, including the settling defendants and then apportion Marine Steel's total damages according to that allocation. The Court disagrees.

*AmClyde* holds that, in an admiralty case involving multiple defendants, some of whom settle with the plaintiff before trial, "the liability of the nonsettling defendants should be calculated with reference to the jury's allocation of proportionate responsibility." 511 U.S. at 204. That approach is essentially a

specific application of the general rule of contribution in tort cases. Since "[c]ontribution rests upon a finding of concurrent fault," it does not apply in cases of strict liability. *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 115 (1974). "Contract liability is strict liability." *CITGO Asphalt Refining Co. v. Frescati Shipping Co.*, 589 U.S. 348, 358 (2020) (quoting Restatement (Second) of Contracts); *accord Board of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 29 (1987) ("Nor are we persuaded that we should create a common-law right of contribution in contract actions.").

*AmClyde* does not change that result. The non-settling defendant discussed in that case had been found 38% liable in tort. While EMR points out that another non-settling defendant had been sued based on a contract, the Supreme Court explicitly "ignore[d]" that defendant because the court of appeals had held that the contract rendered it immune from damages and "[n]o party appeal[ed] that holding." 511 U.S. at 210 n.11 (citing *McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068, 1075-76 (5th Cir. 1992)).

Thus, the Court rejects the application of the "proportionate share approach" in this contract case. Instead, it will apply the "one satisfaction" rule that settlements received for the same injury "reduce a plaintiff's recovery from the nonsettling defendant to prevent the plaintiff from recovering twice from the same

8

assessment of liability." *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000); *see also Mathias v. Jacobs*, 238 F. Supp. 2d 556, 572 (S.D.N.Y. 2002) (applying the rule to contractual liability).

**E.     Prejudgment Interest**

The Second Circuit has instructed that prejudgment interest be granted in admiralty cases "in the absence of exceptional circumstances." *Mitsui & Co. v. Am. Export Lines, Inc.*, 636 F.2d 807, 823 (2d Cir. 1981). The rate to be used rests "firmly within the sound discretion of the of the trial court," but "should be measured by interest on short-term, risk-free obligations." *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir. 1987) (citation, internal quotation marks, and alteration omitted).

Having established the relevant legal rules, the Court now turns to resolving the disputed issues of fact.

## FINDINGS OF FACT

The breach of a valid contract is not in serious dispute. For the sake of completeness, the Court finds that EMR undertook a contractual duty to pay for any repairs, beyond normal wear and tear, necessitated by its use of the barges, and that it breached that duty upon the termination of its hire.

EMR preliminarily argues that Marine Steel failed to prove that *any*

9

damages occurred during EMR's hire of the three barges. This argument is based on the type of surveys conducted prior to EMR's hire. As explained by the trial testimony of Marine Steel's expert, Richard Meyerrose, an "on-hire" survey extensively details the condition of and damage to a vessel at a particular point in time; he conducted such surveys after EMR terminated its relationship with EMR and used them to form the bases of his opinions regarding the nature and extent of the damage to the barges. By contrast, the only surveys predating EMR's hire were "condition and valuation," or "off-hire" surveys, which describes the condition of a vessel in more general terms. EMR posits that the lack of pre-damage "on-hire" surveys raises the possibility that some or all of the damage predated the hire.

The Court agrees that inadequate descriptions of a vessel's pre-accident condition can support a factual finding of no causation. *See, e.g.*, *B.W. King, Inc. v. Consol. Iron & Metal Co.*, 310 F. Supp. 471, 473-75 (S.D.N.Y. 1970). But the Court declines to make that finding here. It credits the ample testimony that almost all of the damage observed in the on-hire surveys was caused by improper use of a grapple to move the barges, as well as Meyerrose's testimony that the damage was so extensive and obvious that it would have been included in the pre-accident off-hire surveys if it had existed at the time those surveys were conducted.

Thus, the Court finds that the damages sought by Marine Steel were caused during EMR's hire.[1]

The Court now turns to the principal dispute in this case: the amount of Marine Steel's damages. Marine Steel's valuation expert, Michael Collyer, opined that Barge 2000 had a fair market value of approximately $170,000, while Marine Steel 1 and Marine Steel 2 each had a fair market value of $195,000. By contrast, EMR's expert, Kenneth Hendrix, opined that Barge 2000 had a fair market value of approximately $68,000, while Marine Steel 1 and Marine Steel 2 each had a fair market value of $58,000.

Neither expert's opinion satisfies the Court. This is not a criticism of their expertise. Indeed, both candidly acknowledged that assessing the barges' fair market value was fraught with difficulty because there is virtually no market—let alone a robust market—for barges of comparable age and condition.

Nevertheless, the Court must reject both of their methodologies. Collyer estimated fair market value based on the few listings he could find for barges of a similar "vintage." Tr. at 231. The Court has previously explained why it finds

---

[1] EMR briefly argues that Marine Steel cannot recover for damages to Barge 2000 because it was sold to Gem Line, LLC, in 2013. Marine Steel's principal, Gerard Thornton, testified that Gem Line was an "affiliated" company, Tr. at 94, and it is undisputed that Marine Steel continued to treat the barge as its own until selling it after EMR's hire ended. The Court infers from this that, whatever the legal niceties, Marine Steel was Barge 2000's beneficial owner.

11

that approach unconvincing. *See Garpo Marine Servs.*, 2017 WL 4157284, at *4 ("[The expert's] valuation was based on the advertised 'asking' price of vessels selected from random journals and a database . . . ; he never sought to determine if the vessels listed were actually sold for the prices sought.").[2]

Hendricks, meanwhile, based his estimates on the barges' scrap value. The relevant metric is the fair market value "at the time of loss," or more precisely, just prior to the loss. *See id*. He did so based on the premise that all three barges were past their useful life and, therefore, would fetch the same price with or without damage. But he also acknowledged that repairs could extend their lifespan. That is apparently how Marine Steel operated; the Court finds both that it would have made the repairs had it had the resources to do so, and that it would have been economically reasonable to do so. *Cf. The Helen B. Moran*, 160 F.2d at 505 (noting that fair market value can be shown by "a capitalization of earning capacity").

Because of the burden of proof, *see The Ruthie M.*, 4 F. Supp. at 318, the impact of the lack of sufficient evidence of the barges' fair market value falls on EMR. Accordingly, the Court falls back on repair cost as a measure of damages.

---

[2]Collyer also considered the significant cost of transporting a barge to New York. But Marine Steel is entitled only to the barge's fair market value, not the cost of actually replacing it.

12

Here, too, the evidence is imperfect. Marine Steel proffered actual repair quotes from shipyards as well as Collyer's estimates. The Court finds the quotes more persuasive and rejects the estimates as speculative.

EMR argues that Marine Steel is entitled only to the cost of repairing the ship to a serviceable condition. That may be the rule in tort cases, *see Zeller Marine Corp. v. Nessa Corp.*, 166 F.2d 32, 34 (2d Cir. 1948), but Marine Steel contracted for any repairs beyond normal wear and tear. It is entitled to the benefit of that bargain. *Cottle v. Gallup*, 432 F.3d 43 (1st Cir. 1970), cited by EMR, is not to the contrary and, indeed, held that the plaintiff was entitled to a new engine "in perfect, warranted condition" because the damages could not be repaired to its former status." *Id.* at 44. Accordingly, the Court rejects EMR's argument that Marine Steel seeks the cost of repairing the barges to "as built" condition and repeats its previous finding that the damages sought be repaired were all caused during EMR's hire.

In sum, the Court finds that the quotes provided by Marine Steel accurately reflect the cost of restoring the barges to their condition immediately prior to EMR's hire. Marine Steel offered two quotes for each barge and choosing between them is necessarily arbitrary; to give EMR the benefit of the doubt, the Court will use the lower of the two quotes provided for each barge. Accordingly,

13

the Court finds that the cost of repairing Barge 2000 is $99,508, that the cost of repairing Marine Steel 1 is $67,655, and that the cost of repairing Marine Steel 2 is $132,000, for total damages of $299,163.

EMR argues that Marine Steel failed to mitigate those damages because it was aware that T&T and Sal's were using a grapple to move the barges. The Court finds that it would have been unreasonable for Marine Steel to terminate the hire and potentially incur legal liability to avoid further use of the grapple. Moreover, the Court finds that Marine Steel reasonably informed EMR of T&T and Sal's actions and further, that EMR, once so informed, was in a better position to avoid the damage because T&T and Sal's were working on its behalf.

On the other hand, Marine Steel's damages must be reduced by the amounts it recovered by selling the barges. *See The Helen B. Moran*, 160 F.2d at 506 (explaining that damages are reduced by "any value of the wreck as salvage" and increased by "interest on the net amount from the date of the collision"). Based on the undisputed facts, the Court finds those amounts to be $76,000 for Barge 2000, $23,132 for Marine Steel 1, and $20,529 for Marine Steel 2, for a total of $119,661.

With respect to consequential damages, EMR's explicit promise to repair the barges does not refer to Marine Steel's lost profits and nothing else about the

14

arrangement satisfies the Court that such damages were within the parties' contemplation. Accordingly, the Court does not include lost profits in its award of damages.

Moreover, the award must be reduced by the $53,500 received from T&T and Sal's. Based on the undisputed fact that those amounts secured the dismissal of the claims against those defendants, the Court finds that they partially compensated Marine Steel for the same damages sought from EMR. The Court specifically rejects Marine Steel's argument that the settlements were de minimis and intended to cover only attorneys' fees.

Finally, the Court finds that a one-year Treasury bill issued on November 19, 2018—the date on which Marine Steel sent EMR an invoice for repair costs—supplies an appropriate prejudgment interest rate 2.66% per year.

## CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the Clerk is directed to enter judgment in favor of Marine Steel and against EMR in the principal amount of $126,002, plus $19,063.20 ($126,002 x 0.0266 x 5.6877 years) in prejudgment interest, for a total of $145,065.20. Post-judgment interest shall accrue at the statutory rate until the judgment is paid in full. Marine Steel's request for attorneys' fees is denied without prejudice to filing a motion for such

15

fees within 14 days of the entry of judgment. *See* Fed. R. Civ. P. 54(d)(2). In addition to demonstrating that EMR's counterclaim was frivolous, the motion must provide a legal basis for Marine Steel's claim that it is entitled to attorneys' fees for defending a frivolous counterclaim[3] and supporting documentation regarding the amount and reasonableness of the fees incurred.

      **SO ORDERED.**

                                                         /S/ Frederic Block
                                                   FREDERIC BLOCK
                                                   Senior United States District Judge

Brooklyn, New York
July 31, 2024

---

[3] The sole case cited in Marine Steel's post-trial submissions stands only for the proposition that 28 U.S.C. § 1988 presumptively entitles prevailing plaintiffs to attorneys' fees *in civil rights cases*. *See Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001).